IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 10-800-01 |
| BARRETT BYRON STATON | : | |
| MATTHEW STATON | : | |

**SURRICK, J.**                                                                                          **OCTOBER   31  , 2013**

## MEMORANDUM

Presently before the Court are Defendants' objections to the Government's calculation of the amount of fraud-related loss. The parties have briefed the issues, and a hearing was held on May 31, 2013, at which testimony was presented.

### I. BACKGROUND

#### A. Factual Background

On July 21, 2011, a federal grand jury returned a First Superseding Indictment (hereinafter, "Indictment") against Defendants Barrett Byron Staton, Matthew Staton, and William Haken, Jr. (Indictment, ECF No. 38.)[1] Defendant Barrett Byron Staton was charged with: conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One); wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two through Five); mail fraud, in violation of 18 U.S.C. § 1341 (Counts Six through Nine); and making a false statement in a loan application, in violation of 18 U.S.C. § 1014 (Count Ten). (Indictment.) Matthew Staton was charged with conspiracy to commit wire fraud (Count One), and two counts of wire fraud (Counts Four and

---

[1] Defendant Haken entered a plea of guilty on April 11, 2012 to Count One, conspiracy to commit wire fraud. (Min. Entry, ECF No. 83.)

Five). The trial was held on June 19 through July 2, 2012. On July 3, 2012, the jury returned a verdict finding Defendants guilty on all Counts. (Min. Entry, ECF No. 150.)

Defendants were found guilty of intentionally devising "a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses." (Indictment ¶ 1.) As part of the scheme, Defendant Barrett Byron Staton owned and operated, sometimes through nominees, various office copier broker businesses ("Businesses"). (*Id.* at ¶ 2.) These Businesses were: (1) Access Business Solutions, Inc. ("ABS"); (2) First Choice Imaging, LLC ("FCI"); (3) First Choice Financial Leasing Company, Inc. ("FCFLC"); (4) NBS Document Solutions, also known as New Business Systems, LLC ("NBS"); (5) World Trade Systems ("WTS"); (6) United Office Products ("UOP"); and (7) Ultra Business Systems, LLC ("Ultra"). (*Id.*) Matthew Staton was employed as a salesman for these Businesses. (*Id.*)

The Businesses served as brokers between small businesses or non-profit organizations wishing to obtain new copy machines ("Customers") and financing companies that specialized in funding office copier leases. (*Id.* at ¶ 3.) Defendants would have the Customers complete a copier lease and an application for financing. Defendants would present the completed and signed lease and application to the financing company. (*Id.*) If the Customer's credit was acceptable, the financing company would fund the lease by giving the Business a lump sum payment of up to 125 percent of the value of the leased copier. (*Id.*) The financing company intended that this lump sum payment would be used by the Business to fund the cost of purchasing and installing the new copier at the Customer's place of business. The excess was retained by the Business as its profit. The financing company would then collect the monthly lease payments from the Customer over the term of the copier lease. (*Id.*)

2

Defendants "enticed" Customers to enter into new leases for copiers by offering package deals in which copiers could be leased at lower monthly rates than what their competitors charged, and by offering other valuable discounts, such as unlimited copies, servicing, maintenance, and supplies. (*Id.* at ¶ 4.) Defendants also offered to "buy out" the Customers' existing copier leases, return the copier to the prior financing company, and include this cost as part of the new and much lower copier lease payment. (*Id.* at ¶ 5.) In addition, Defendant would alter some leases and financing applications, which the Customers had already signed, to include additional copiers or features that the Customer did not order and ultimately never received. (*Id.* at ¶ 6.) This practice increased the apparent value of the lease and, as a result, the lump sum payment that the Businesses would receive from the financing companies. (*Id.*) Ultimately, the Businesses would not pay off the Customer's prior leases as promised. They would, instead, retain a greater portion of the lump sum payment from the financing companies for their own use. (*Id.* at ¶ 7.)

Defendants also induced Customers to complete new lease applications under the guise of "refinancing" their leases on existing copiers, then submit the new applications to a different financing company. (*Id.* at ¶ 8.) Under this scheme the refinancing would result in a lower monthly payment. (*Id.*) As a result of this practice, the Businesses would receive a lump sum payment from the second financing company for the present value of the refinanced copier leases. (*Id.* at ¶ 9.) However, Defendants would not pay off the first lease, and instead kept the funds received. (*Id.*) Consequently, the Customers became obligated to make two separate lease payments on one copier and the Businesses were able to collect two lump sum payments for each copier. (*Id.*) Defendants also did not return the existing copiers to the financing company as promised. (*Id.* at ¶ 10.) Defendants would periodically close one Business and reopen it under a

different business name in order to perpetuate the fraud. (*Id.* at ¶ 13.) In some cases, the new Business would be opened under the name of a nominee owner to conceal the involvement of Defendant Barrett Byron Staton. (*Id.*)

In executing the fraudulent scheme, Defendants submitted fraudulent applications to financing companies electronically by facsimile or e-mail. (*Id.* at ¶ 11.) Defendants would receive payments from the financing companies through interstate wire transfers conducted through financial institutions, or checks through the United States Postal Service or commercial carriers. (*Id.* at ¶ 12.)

### B. Procedural History

In anticipation of sentencing, the Government filed a sentencing memorandum on April 12, 2013. (Gov't's Sent. Mem., ECF No. 218.) In response, Barrett Byron Staton filed a sentencing memorandum on April 22, 2013. (ECF No. 219.) Matthew Staton filed a sentencing memorandum on May 24, 2013. (ECF No. 228.) On May 31, 2013, a hearing was held to determine the amount of fraud-related loss attributable to Barrett Byron Staton and to Matthew Staton. (May 31, 2013 Hr'g Tr., ECF No. 241.) Prior to the start of the testimony, Matthew Staton was removed from the hearing due to his continuous disruptive outbursts. Defendant was warned that he would be expelled from the hearing if he continued disrupting the proceeding. After this warning and a brief recess to permit him to compose himself, the hearing resumed. Matthew Staton continued to be disruptive. As a result, his bail was revoked, and he was remanded to the custody of the United States Marshals. The hearing continued in his absence. At the conclusion of the hearing, counsel were directed to file supplemental memoranda of law addressing the issues raised at the hearing.

On June 21, 2013, Barrett Byron Staton filed a Supplemental Memorandum Relative to Determination of Loss and Restitution. (Barrett's Mot., ECF No. 240.) The Government responded on July 2, 2013. (Gov't's Resp., ECF No. 243.) On July, 8, 2013, Matthew Staton, filed a *pro se* sentencing memorandum that addressed his objections to the pre-sentence report and the Government's sentencing memorandum. (Matthew's Mot., ECF No. 244.)[2] On October 23, 2013, Matthew Staton's counsel filed a Motion To Preclude Imposition Of A Sentence In Excess Of Defendant's Base Offense Level. (ECF No. 252.)[3]

## II. DISCUSSION

Barrett Byron Staton objects to the loss calculations provided by the Government. He contends that he is unable to verify the underlying reliability of the Government's figures. (Barrett's Mot. 4.) He claims that the Government failed to provide appropriate supporting documentation to assure that the loss calculations are accurate and reliable. (*Id.* at 10.) The Government responds that their methodology satisfies the standard of proof under the Federal Sentencing Guidelines and allows the Court to make a "reasonable estimate of loss," which is all that is required. (Gov't's Resp. 3.)

### A. Legal Standard

---

[2] At the May 31st hearing, in addition to his disruptive outbursts, Matthew Staton advised that he wished to dismiss his lawyer and represent himself. In the beginning of August 2013, we received a letter from Matthew Staton apologizing for his conduct at the hearing. On August 14, 2013, his attorney filed a Petition For Writ Of Habeas Corpus/Motion To Release And Reinstate Bail. (ECF No. 245.) At a hearing on the Motion on August 16, 2013, Defendant's bail was reinstated and counsel was advised that he could submit a memorandum dealing specifically with the fraud loss related to Matthew Staton.

[3] Like Matthew Staton's pro se memorandum, this Motion simply makes objection to the various offense level enhancements in the Presentence Investigation Report asserting that these enhancements are improper because they were not submitted to the jury and were not established beyond a reasonable doubt. These arguments will be addressed at sentencing.

Section 2B1.1 of the Sentencing Guidelines provides for increases to a defendant's offense level based upon the amount of loss attributable to fraud. U.S.S.G. § 2B1.1(b)(1). The Government must establish the amount of the loss by a preponderance of the evidence. *United States v. Ali*, 508 F.3d 136, 145 (3d Cir. 2007) ("Loss amount is a sentencing fact (a specific offense characteristic), so it must be found by a preponderance of the evidence."). The Government has the burden to prove facts in support of a sentence enhancement; "the defendant does not have to 'prove the negative' to avoid the enhanced sentence." *United States v. Evans*, 155 F.3d 245, 253 (3d Cir. 1998); *see also United States v. Tupone*, 442 F.3d 145, 156 (3d Cir. 2006) ("Under the Guidelines, the Government has the burden of showing the amount of loss resulting from criminal conduct."). Once the Government establishes a prima facie case, the burden of production shifts to the defendant, but the ultimate burden of persuasion remains with the Government. *Evans*, 155 F.3d at 253. Only after the Government has made a prima facie showing must the defendant "come forward with evidence tending to cast doubt on the [G]overnment's evidence." *Id.* (citing *United States v. Raven*, 39 F.3d 428, 434-35 (3d Cir. 1994)).

"The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 Application Note 3(C). In determining the sentence, "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); *see also United States v. Green*, 516 F. App'x 113, 132 (3d Cir. 2013) (citing *United States v. Inigo*, 925 F.2d 641, 660 (3d Cir. 1991)).

### B. Loss Calculations

The Government divides the victims into three categories: (1) Finance Companies; (2) Individual Victims; and (3) Car Fraud. Based on the voluminous evidence offered at trial and the evidence offered at the hearing, the Government contends that Defendant Barrett Byron Staton caused losses in the amount of $2,070,529.74, while Matthew Staton is responsible for causing losses in the amount of $1,967,926.10. (Gov't's Resp. 1.)

#### 1. *Finance Companies*

The Government contends that the Finance Companies, which included Great America, U.S. Express Leasing, J.J. Bender, also known as Graphic Savings Group, and CIT, sustained total losses of $1,496,354.68. (Gov't's Resp. 3.) In support of the loss figures, the Government called three witnesses: (1) Special Agent Stephen Rich of the Federal Bureau of Investigation ("F.B.I.") (May 31 Hr'g Tr. 20-47); (2) Krista Leis, an employee of CIT Financing Company (*Id.* at 67-85); and (3) Aimee Kramer, an employee of Great America (*Id.* at 85-95). The Government also offered into evidence spreadsheets that had been prepared by each company setting forth their loss figures.

Agent Rich testified that he interviewed representatives from U.S. Express and J.J. Bender regarding how they arrived at the loss figures reported in the spreadsheets. Agent Rich interviewed Bill Welford, the workout manager of U.S. Express, and Bill Carey, general counsel. (*Id.* at 23.) Welford explained that he had forty years of experience in the office equipment leasing industry, and that he worked with companies in the recovery of funds and repayment plans. (*Id.* at 24.) Welford reviewed U.S. Express' loss figures for accuracy and explained that

7

the numbers used in the spreadsheet came from the "Info-lease" database system. (*Id.*)[4] U.S. Express started with the amount of the lease at issue, subtracted any payments that had been received on the lease, and added any legal expenses, to arrive at their final loss amounts. (May 31 Hr'g Tr. 25-26.) In total, U.S. Express claimed $425,786 in losses. (Gov't's Ex. 2, May 31 Hr'g Tr.)[5]

Agent Rich also interviewed Andrew Bender, the owner and operator of J.J. Bender. (May 31 Hr'g Tr. at 29.) Bender submitted a loss affidavit (Gov't's Ex. 3b) and a spreadsheet showing the amount of loss sustained by J.J. Bender (Gov't's Ex. 3c). (May 31 Hr'g Tr. at 30-31.) Andrew Bender reviewed J.J. Bender business records to determine the amount of the losses sustained. Bender included legal fees in this amount because he had retained an outside law firm to assist in the filing of a Federal lawsuit in connection with the fraudulent contracts at issue. (*Id.* at 33.) In addition, Agent Rich testified that the contracts listed in the spreadsheet were the same contracts that Bender testified about at trial. (*Id.* at 31-32.) J.J. Bender attributed $361,062 in losses to Defendants' fraudulent scheme. (Gov't's Ex. 3a.)

Krista Leis, Director of Vendor Solutions for CIT Financing Company, and Aimee Kramer, an employee of Great America, also testified on behalf of the Government. Both Leis and Kramer submitted spreadsheets setting forth the losses sustained by their companies as a result of Defendants' fraud. (Gov't's Exs. 1, 4.) Leis and Kramer used their respective Info-Lease databases to compile the amounts used in the spreadsheets. (May 31 Hr'g Tr. 87.) Both of these witnesses had also testified at trial with regard to losses associated with the contracts

---

[4] The Info-lease System is a "proprietary-based system, routinely used by finance companies in the office equipment lease industry." (Gov't's Resp. 4.)

[5] The parties submitted exhibits at the May 31 hearing. These exhibits are on file with the Court.

listed in the spreadsheets. Leis testified that she arrived at the loss numbers by adding "the amount funded, plus the accrued income, plus the accrued residual, minus all payments or settlements received." (*Id.* at 69.) Leis also stated that the figures used in the spreadsheet are the subject of internal and external audits. (*Id.* at 78.) CIT Financing sustained total losses in the amount of $291,496.22. (Gov't's Ex. 4.) Kramer testified that Great America's losses were calculated by subtracting any payments made by the lessee from the original amount of the lease contract, and subtracting any money recovered from a settlement or bankruptcy on the account. (May 31 Hr'g Tr. 88.) In addition, Kramer explained that any legal fees incurred by Great America in recovering funds were added to the amount of the loss. Great America suffered $418,010.46 in losses as a result of Defendants' fraudulent scheme. (*Id.* at 90.)

### 2. *Individual Victims*

The Government claims that the individual victims sustained $471,571.42 in losses. (Gov't's Ex. 5.) Agent Rich testified that in order to obtain the loss amounts from individual victims, loss affidavits were sent to approximately 300 individual victims. (May 31 Hr'g Tr. 34.) Approximately seventy-nine of those individuals completed and returned the affidavits to Agent Rich. (*Id.*) After receiving the affidavits, Agent Rich personally contacted twenty-six of the businesses and verified their loss figures. (*See id.* at 39-40; Gov't's Ex. 5.)

### 3. *Car Fraud*

Defendant Barrett Byron Staton was convicted of fraudulently obtaining two GMC Denali Sport Utility Vehicles, one BMW Sedan, and one Mercedes Benz Sedan. In total, the net loss amount attributed to Defendant's car fraud is $102,603.64. (May 31 Hr'g Tr. 45.) Agent Rich testified that he determined the net loss by starting with the amount the financing companies financed on the cars. He then subtracted any payments that were received on the

9

vehicles, and also subtracted any value received from the repossession and sale of the vehicles. (*Id.* at 43.) Agent Rich verified the car fraud loss figures by contacting the financing companies responsible for the car loans. (*Id.*) The losses associated with the car fraud have not been attributed to Matthew Staton.

      C.      **Reliability of the Evidence**

Defendant contends that the testimony and evidence presented at the hearing was not sufficiently reliable to determine the loss attributed to Defendants' fraud. Defendant seems to suggest that a formal audit of the books of the victims is required. It is not. Defendant has presented no evidence whatsoever indicating that the information presented at trial or the information contained and summarized in the Government's spreadsheets, or the information in the victims' affidavits is unreliable or erroneous. Rather, Defendant suggests that the loss figures calculated by the Government could contain errors.

In support of this assertion, Defendant called Michael Shannahan, a senior director from Kroll Advisory Solutions, to offer testimony evaluating the Government's documentation of the victim's losses. (May 31 Hr'g Tr. 96.) Shannahan testified that he did not feel that there was "sufficient relevant data or information available to provide a basis for an opinion with respect to the investor losses." (*Id.* at 98.) He further concluded that "summary schedules or victim affidavits" did not provide "sufficient support to independently confirm the loss amounts." (*Id.*) As the Government noted, Shannahan reached his conclusions without looking at the trial transcript and exhibits which included the contracts at issue and comparing these to the loss affidavits and the spreadsheets that were submitted by the victims. (*Id.*) He failed to point to any errors, or omissions in the Government's calculations, nor did he state why the victim's

10

affidavits were unreliable.  We reject Defendant's challenge to the Government's loss calculation.

The Government has provided more than sufficient evidence and testimony to permit this Court to make a reasonable estimate of the loss.  The Government has offered the sworn testimony of a federal agent, and of two representatives from finance companies defrauded by Defendants.  *See United State v. Romero*, 410 F. App'x 460, 462-63 (3d Cir. 2010) (concluding it was not clear error to credit the testimony of an FBI special agent regarding the losses sustained by the victims).  Moreover, the individual victims submitted sworn affidavits that were generated under penalty of perjury.  In addition, as the Government correctly observes, the testimony at the hearing was based on business records and supported by the contracts and exhibits introduced at trial. (Gov't's Resp. 10-11.)  The Government clearly made out a prima facie case of the amount of loss suffered by these victims.  Defendant failed "to provide evidence that the Government's evidence is incomplete or inaccurate."  *United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008).  We need make only a "reasonable estimate" of the fraud loss.  The Government has provided more than sufficient testimony and evidence to permit us to do that.

**D.     Attorney's Fees**

Defendant baldy asserts, without providing any legal support or argument, that attorney's fees cannot be included in the Government's loss determination.  (Def.'s Mot. 4-5.)  The Government contends that legal fees are a "reasonably foreseeable pecuniary harm" caused by Defendant's conduct, and therefore Defendant is responsible for these fees.  (Gov't's Resp. 11-12.)

Under the Sentencing Guidelines, loss is the "greater of actual loss or intended loss." U.S.S.G. § 2B1.1, Application Note 3(A).  Actual loss is defined as the "reasonably foreseeable

pecuniary harm that resulted from the offense." *Id*. Application Note 3(A)(i). In turn, "reasonably foreseeable pecuniary harm" means harm "that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id*. Application Note 3(A)(iv).

Here, Defendant knew, or reasonably should have known that the victims would incur legal expenses as a result of the fraudulent scheme. Victims initiated lawsuits in order to recover funds stolen by Defendants. The attorneys' fees were a direct result of Defendants' fraud and reasonably foreseeable by Defendants. *See United States v. Howard*, 262 F. App'x 571, 574 (5th Cir. 2008) (including attorneys' fees in the loss calculation because the fees were directly caused by the defendant's actions and reasonably foreseeable to her); *see also United States v. DeRosier*, 501 F.3d 888, 895 (8th Cir. 2007) (holding that costs incurred by a bank in investigating the defendant's fraudulent conduct could be included in the loss calculation as an investigation was a reasonable and foreseeable result of the defendant's conduct). Moreover, Defendants were on notice of civil litigation as a result of their scheme because Andrew Bender, one of the victims, had already initiated a lawsuit while Defendants' fraud was ongoing. (Gov't's Resp. 11.) Clearly, it is appropriate to include attorney's fees in the Government's loss calculation.

### III. CONCLUSION

We are satisfied that the Government has proven the fraud losses sustained by the victims by a fair preponderance of the credible evidence. Accordingly, we accept the Government's calculation of these fraud-related losses.

An appropriate Order follows.

                                                       **BY THE COURT:**

                                                      **R. BARCLAY SURRICK, J.**